UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | Case No.: 3:16-cv-02372-CAB-(WVG) |
|---|---|
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 52(a) |
| v. | |
| PC IRON, INC., | |
| Defendant. | |

This matter is before the Court for the determination of whether defendant PC Iron, Inc. ("PCI") unlawfully terminated an employee due to her pregnancy and/or recent childbirth in violation of Title VII of the Civil Rights Act. The case is brought by the U.S. Equal Employment Opportunity Commission ("EEOC") on behalf of the public seeking injunctive remedies against PCI to correct the alleged unlawful employment practice.

## I. Procedural Background

On September 21, 2016, the EEOC filed this action against defendant PCI, alleging PCI fired an employee, Elsa Perez, based on her pregnancy and/or recent childbirth, in violation of Title VII of the Civil Rights Act of 1964, as amended, the Pregnancy

Discrimination Act of 1978 ("Title VII"). [Doc. No. 1.]¹ The EEOC's complaint, as amended on December 15, 2016, sought to provide appropriate relief to Ms. Perez and correct unlawful employment practices on the basis of sex. [Doc. No. 5.] On September 5, 2017, Ms. Perez filed a complaint in intervention against PCI directly seeking relief for the alleged discrimination. [Doc. No. 20.]

The parties filed cross motions for summary judgment on February 27, 2018. [Doc. Nos. 48, 50, 51 and 54.] On May 1, 2018, the Court issued an order granting in part and denying in part the motions and set the matter for trial commencing July 30, 2018. [Doc. Nos. 73 and 77.] On July 6, 2018, Ms. Perez and PCI filed a joint motion to dismiss her complaint in intervention. [Doc. No. 97.] The dismissal with prejudice was entered on July 9, 2018. [Doc. No. 99.] The Court thereafter directed the EEOC and PCI to submit a revised Pretrial Order, recognizing the matter was now solely a request for injunctive relief to correct the alleged unlawful employment practice on the basis of sex, and would therefore proceed as a bench trial. [Doc. No.100.] The July trial date was vacated and trial was reset for October 29, 2018. [Doc. No. 102.] The revised Pretrial Order was entered on September 18, 2018. [Doc. No. 104.]

The EEOC and PCI proceeded to a two-day bench trial on October 29 and 30, 2018. [Doc. Nos. 110, 112.] Based upon the testimony and exhibits received into evidence at trial, and after full consideration of the legal arguments of the parties, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).²

/////

/////

---

¹ Document numbers and page references are to those assigned by CM/ECF for the docket entry.

² Any portions of this opinion expressed as factual findings that should be considered conclusions of law are so designated, as well as any legal conclusions that should be considered factual findings are so designated.

## II. Findings of Fact and Conclusions of Law

### A. Findings of Fact

1. PCI, a California corporation, operates as a fabricator and erector of structural steel and iron for construction projects in San Diego County. The business has been in operation since 1979. [Doc. No. 117, at 8:13-17.] In 2011, Gerald Anderson was the owner, president and chief operating officer of PCI. [Doc. No. 116, at 175:14-19.]

2. Marlene Suits was the office manager for PCI. She began working at PCI in approximately November, 1979. She reported directly to Mr. Anderson. Ms. Suits retired in August, 2018. Ms. Suits hired Elsa Perez in 2003 as an office assistant and supervised Ms. Perez. [Doc. No. 116, at 99:14-100:2, 11-12; 102:4-6, 14-20.]

3. Elsa Perez was employed as a receptionist/office assistant at PCI. Her job duties included basic clerical tasks such as answering the phone and recording payroll data on compensation cards. Ms. Perez started in approximately May, 2003, and worked for PCI until approximately November, 2006, when she left to take a position with another company. [Doc. No. 116, at 102:21-103:3; Trial Ex. 17.]

4. Ms. Perez returned to PCI as a receptionist/office assistant on March 26, 2007, at the request of PCI's office manager Ms. Suits. Ms. Perez receive a salary increase and health benefits when she returned. [Doc. No. 116, at 103:8-21; Trial Exs. 3, 17; Trial Ex. 44[3], at 66:16-67:3.]

5. When Ms. Perez was hired in 2003 she had two school-age children. [Trial Ex. 44, at 30:9-12; Doc. No. 116, at 105:4-12.] During her employment with PCI, Ms. Perez occasionally requested time off related to childcare issues. PCI never denied her request to take time off from work for reasons related to her children. [Trial Ex. 44,

---

[3] Although Ms. Perez appeared briefly at trial, she was deemed unavailable to testify for medical reasons. The parties stipulated that her deposition could be used in lieu of her live testimony pursuant to Federal Rules of Evidence 804(a)(4)and (b)(1). The Court therefore did not have the benefit of her personal appearance at trial. Her testimony is limited to designated excerpts from her deposition.

at 30:13-36:21.] Ms. Perez was never disciplined for poor attendance. [Doc. No. 116, at 105:13-17.] Her work performance was considered satisfactory. [*Id.*, at 180:8-14.]

6. In approximately March, 2011, Ms. Perez informed Mr. Anderson and Ms. Suits she was pregnant. [Trial Ex. 44, at 108:16-109:12.]

7. In August, 2011, Ms. Perez requested maternity leave from September 28, 2011 to December 9, 2011, an estimated four weeks prior to her due date and for six weeks after her anticipated delivery date. [Trial Ex. 4.] PCI approved her request. [Doc. No. 116, at 133:3-22; Trial Ex. 44, at 110:18-22.]

8. Prior to taking her maternity leave Ms. Perez made no requests to PCI for any accommodation due to her pregnancy. No evidence was presented that prior to taking her maternity leave Ms. Perez asked for and was denied any requests for time off to attend doctor's appointments, or denied any medical or other pregnancy-related accommodation. [Doc. No. 116, at 133:23-25.]

9. PCI arranged for a temporary employee to cover Ms. Perez's position while she was on maternity leave. PCI anticipated Ms. Perez would return to her job on December 12, 2011. [Trial Ex. 44, at 113:14-114:13; Doc. No. 116 at 134:1-13; Doc. No. 117 at 12:18-25.] PCI employed Desarea Dutra Clayburg through the AppleOne staffing agency to cover Ms. Perez's position during her leave. [Doc. No. 116, at 118:10-13; 119:24-120:1.]

10. Ms. Perez commenced her maternity leave on or about September 28, 2011. Ms. Perez did not like her work at PCI and did not want to return to her job. While Ms. Perez was on her maternity leave she was actively looking for other employment. [Trial Ex. 44, at 130:22-131:11; 134:13-22.]

11. Late November and early December, 2011, Ms. Suits attempted several times to contact Ms. Perez to confirm that she would be returning to work on December 12, 2011. [Doc. No. 116, at 108:24-109:11; 134:14-135:2; Trial Ex. 44, at 125:24-126:5.] Ms. Perez avoided communicating with Ms. Suits, returning her calls at

times she was aware Ms. Suits was likely to be out of the office. [Trial Ex. 229, at 44:19-45:5; 62:2-18; 153:22-155:13.]

12. Eventually Ms. Suits and Ms. Perez connected and Ms. Suits inquired about whether Ms. Perez would be returning on December 12, 2011. Ms. Perez indicated that she intended to but was still working on arrangements for childcare for her baby. [Trial Ex. 44, at 126:4-19; Doc. No. 116, at 135:8-11.]

13. Ms. Perez stated she was seeking subsidized childcare assistance and that she would drop off forms for Ms. Suits to sign. Ms. Perez came by the PCI office when Ms. Suits was not working; she did not leave any forms. Ms. Suits never received any childcare assistance forms. [Trial Ex. 44, at 126:4-19; Doc. No. 116 at 111:19-112:7; 113:13-20; 135:12-19; Trial Ex. 229, at 48:1-49:2.]

14. Ms. Suits had a subsequent telephone conversation with Ms. Perez about her return date and Ms. Perez again indicated some reluctance about returning to work. [Doc. No. 116, at 135:20-136:8.]

15. Ms. Suits consulted Mr. Anderson about the options available if Ms. Perez did not wish to return to work. They agreed to offer Ms. Perez the option to separate from the company and make an unemployment claim so she could stay home with her new baby. [*Id*., at 136:9-137:4; Doc. No. 117, at 17:25-18:21; 24:21-25:23; 26:2-27:12.]

16. On December 9, 2011, the Friday before Ms. Perez was to return to work, Ms. Suits and Ms. Perez spoke on the phone. Ms. Suits gave Ms. Perez the option that if she did not want to return to work on December 12, 2011, she could separate from the company and collect unemployment. [Doc. No. 116, at 137:5-139:14; 146:7-147:10.]

17. Ms. Dutra testified that leading up to that December 9 phone call, Ms. Perez was avoiding Ms. Suits and it appeared to her that Ms. Perez did not intend to return to work. [Trial Ex.229, at 62:2-18.] Ms. Dutra overheard portions of Ms. Suit's side of the December 9 phone conversation and Ms. Dutra did not have the impression

that Ms. Suits terminated Ms. Perez, nor did she hear Ms. Suits tell Ms. Perez she was terminated or fired. [Trial Ex. 229, at 155:14-157:4; 175:23-176:17.]

18. Ms. Perez did not return to work on Monday, December 12, 2011. On January 9, 2012, PCI completed Ms. Perez's claim for Paid Family Leave, commencing on December 10, 2011. [Trial Ex. 6.]

19. EEOC provided no evidence that during her pregnancy or with regard to her maternity leave, PCI denied any accommodation that Ms. Perez requested.

20. The Court found the testimony of Ms. Perez, Gary Berkstresser and Elaine Rossi[4] about office interactions between Ms. Suits and Mr. Anderson and Ms. Perez regarding her pregnancy to be unreliable[5] and either exaggerated or not credible in many instances.

21. Ms. Perez testified that Ms. Suits expressed dissatisfaction about the amount of time Ms. Perez submitted for maternity leave, but acknowledged that she received all the time she requested. [Trial Ex. 44, at 112:2-12.]

22. Ms. Perez also testified that at some point during her pregnancy, Ms. Suits told her she would not allow Ms. Perez time off to take the baby to doctor's appointment when she returned to work after her leave. [*Id.*, at 95:19-96:1.] Ms. Perez however acknowledged that Ms. Suits had never denied her time off for her childcare needs during her entire employment with PCI. [*Id.*, at 30:13-36:21.]

23. It was PCI's office practice regarding incoming phone calls that Ms. Perez or Ms. Suits should answer all incoming calls after two rings. If either of them was unavailable, it was expected that any other PCI employee, including Mr. Anderson, would answer the phone following the third ring. [Doc. No. 117, at 27:18-28:13.]

---

[4] The Court regards Ms. Rossi's testimony regarding the two weeks [Doc. No. 116, at 33:14-18] she worked at PCI in September 2011 as completely unreliable, particularly in light of Ms. Rossi's attempt on the witness stand to repudiate her declaration signed in 2017 [Trial Ex. 228] by suggesting it was a document faked or forged by defense counsel. [Doc. No. 116, at 39:17-42:23.]

[5] As an example, Ms. Perez testified that she left employment with PCI in 2010, contrary to the records that demonstrate she left in 2006 and returned in March of 2007. [Trial Ex. 44, at 62:7-18.]

24. Ms. Perez testified that on one occasion because she needed to use the restroom due to her pregnancy, she was not at her desk to answer the phone, and Mr. Anderson had to answer the phone. Ms. Perez testified this made Mr. Anderson so upset that when she was returning to her desk he yelled at her, in front of PCI employees Gary Berkstresser and Ty Moody. She testified "he yelled at me that I needed to make other accommodations with Marlene [Ms. Suits] before I used the restroom and that he didn't give a fuck if I peed in the trash can." [Trial Ex. 44, at 47:16-48:21; 55:10-55:2.]

25. Mr. Anderson denied making such a statement to Ms. Perez. [Doc. No. 117, at 12:7-14.] Mr. Moody denied ever hearing Mr. Anderson make such a remark to Ms. Perez. [*Id.*, at 39:20-40:5.] Clifford Gunther, whose office was adjacent to reception and Mr. Anderson's office, testified he never heard Mr. Anderson make such an outrageous statement or say anything inappropriate to Ms. Perez related to her pregnancy. [*Id.*, at 49:4-25.]

26. Mr. Berkstresser's trial testimony contradicted Ms. Perez's account, stating that Mr. Anderson had not yelled at Ms. Perez, but rather made the comment to him in jest, and Mr. Berkstresser believed Ms. Perez overheard it. [Doc. No. 116, at 64:7-13; 79:13-18.]

At his deposition Mr. Berkstresser offered yet another different version of events, testifying:

> Q: You testified that he [Mr. Anderson] made a comment about Ms. Perez needing to get a bucket to go to the restroom because he was upset that she was going to the restroom too often; is that correct?
> A: Yes.
> Q: Did you actually hear this comment from Mr. Anderson?
> A: I think – honestly, I think Elsa [Ms. Perez] said to me about the comment was made to her.
> Q: Okay.

```
1        A. The one about the bucket.
2        *****
3        Q: Did you ever hear Mr. Anderson make comments about Ms. Perez
4        not being able to answer the phone because she had to go to the
5        bathroom due to her pregnancy?
6        A: No.
```
7   [Doc. No. 116, at 79:1-4, 19-21; Ex. 49, at 31:10-21; 45:25-46:4.]
8   The Court does not find the testimony of Ms. Perez or Mr. Berkstresser regarding this alleged incident credible.[6]

27. Ms. Perez testified that in March when she told Mr. Anderson and Ms. Suits she was pregnant, Mr. Anderson's response was to congratulate her. [Trial Ex. 44, at 108:16-109:17.] Ms. Perez testified that Ms. Suits, however, remarked at that time that it was a stupid decision for Ms. Perez, a single mother, to have a third child. [*Id.*, at 91:18-22.] Ms. Suits denied making this comment. [Doc. No. 116, at 150:1-13.]

28. Regardless of whether Ms. Suits made this unwelcome comment in March 2011, in response to Ms. Perez's pregnancy announcement, no evidence was presented that Ms. Suits went on to deny Ms. Perez any pregnancy-related work accommodations.

**B. Conclusions of Law**

29. Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation,

---

[6] An inordinate amount of trial time was spent on whether Mr. Anderson made a single remark to Ms. Perez about her bathroom needs during her pregnancy. Although the Court concludes that Ms. Perez's version of this exchange is not credible, even if Mr. Anderson made such a remark in the manner related by Mr. Berkstresser, it does not support the EEOC's theory that Ms. Suits subsequently terminated Ms. Perez at the conclusion of her maternity leave because Ms. Suits was annoyed at Ms. Perez's pregnancy and maternity leave, or that Ms. Suits anticipated that Ms. Perez would not be a reliable employee going forward due to her childcare responsibilities.

terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

30. "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

31. "An unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

32. To assert a case of discrimination under Title VII, the EEOC must demonstrate that: (1) Perez is a member of a protected class, (2) Perez was qualified for the position in question, (3) Perez was subject to an adverse employment action, and (4) similarly situated individuals outside Perez's protected class were treated more favorably. *Campbell v. Hawaii Dep't of Educ.,* 892 F.3d 1005, 1012 (9th Cir. 2018) (citing *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000)).

33. The Court finds that the EEOC has not met its burden, in that it has not demonstrated that Perez suffered an adverse employment action. Although the EEOC attempted to demonstrate that Ms. Suits fired Ms. Perez on December 9, 2011, because Ms. Suits was annoyed about Ms. Perez's pregnancy and maternity leave and/or Ms. Suits anticipated that Ms. Perez would be deficient in her work performance due to childcare issues, the evidence did not support this inference.

34. PCI employed Ms. Perez from 2003 to 2006, when Ms. Perez voluntarily left, while Ms. Perez was providing care for young children. She was never denied time off for her parental responsibilities or otherwise adversely treated. Ms. Suits sought out and rehired Ms. Perez, a single mother, in 2007 aware of her childcare responsibilities. PCI even gave Ms. Perez a pay increase and benefits to get her to return.

35. Ms. Perez was not denied any pregnancy or childbirth-related accommodation. She took her full maternity leave, including four weeks in advance of the birth and six weeks following.

36. Ms. Perez would not confirm that she was ready to return to work on December 12, 2011. She evaded conversations with Ms. Suits and was equivocal about her return date. At the same time Ms. Perez was actively seeking other employment opportunities.

37. On Friday, December 9, 2011, unable to get a commitment from Ms. Perez that she was ready to return to work on Monday, December 12, 2011, Ms. Suits offered Ms. Perez the option to voluntarily separate from the company and make an application for unemployment benefits. Ms. Perez accepted that option and submitted a claim for Paid Family Leave.

38. The Court finds that PCI and Ms. Perez reached a mutual and voluntary agreement for Ms. Perez to separate her employment and she was not subject to an adverse employment action. The Court therefore will enter JUDGEMENT for the Defendant, PCI.

It is **SO ORDERED**.

Dated: November 20, 2018

Hon. Cathy Ann Bencivengo
United States District Judge